Miguel Angel AYALA–GERENA, et al., Plaintiffs—Appellants,

v.

BRISTOL MYERS–SQUIBB COMPANY, d/b/a Bristol Myers–Squibb, et al., Defendants—Appellees.

No. 95–1867.

United States Court of Appeals, First Circuit.

Heard Feb. 27, 1996.

Decided Sept. 5, 1996.

Jesús Hernández–Sánchez, with whom Hernández–Sánchez Law Firm, San Juan, PR, was on brief, for appellants.

Carl Schuster, with whom Schuster Aguiló & Santiago, Hato Rey, PR, was on brief, for appellees.

Before TORRUELLA, Chief Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.

TORRUELLA, Chief Judge.

Plaintiffs–Appellants, former employees of Squibb Manufacturing, Inc. ("SMI"), their wives, and their conjugal partnerships, brought action below seeking damages arising from the termination of their employment. They brought alleged violation of their civil rights under 42 U.S.C. § 1981 due to their dismissal due to their national origin and/or race as Puerto Ricans; violation of their right to privacy under § 8 of Article II of the Constitution of the Commonwealth of Puerto Rico; defamation under 32 L.P.R.A. § 3141–3149; and for breach of contract.[1] The United States District Court, District of Puerto Rico, dismissed the last claim and granted summary judgment on the first three in favor of Defendants–Appellees, Bristol–Myers Squibb Co. ("BMSC") and four of its employees: Mark Geraci, Director of Corporate Security ("Geraci"), Eugene Hackett, Manager of Corporate Security ("Hackett"), Tibur Kerr, Acting Plant Administrator ("Kerr"), and Bryan Dunne, Manager of Corporate Security ("Dunne"). This appeal ensued. We affirm.

## BACKGROUND

Reviewing the summary judgment materials in the light most favorable to Appellants, the nonmovants, and drawing all reasonable inferences in their favor, see, e.g., Alan Corp. v. Int'l Surplus Lines Ins. Co., 22 F.3d 339, 341 (1st Cir.1994), we present a thumbnail sketch of the factual background, providing greater detail as the need arises.

Appellants, all Puerto Ricans, were regular employees of SMI—which is not a party to this action—in Humacao, Puerto Rico. It is uncontested that SMI's employees are mostly Puerto Rican. According to Appellants' complaint, Geraci, Hackett, Kerr and Dunne of BMSC were sent to Puerto Rico in 1991 and 1992 in connection with a security investigation regarding missing inventory at SMI and the suspected illegal trafficking of pharmaceutical drugs and other products. According to Appellants' complaint, Appellees developed a "discriminatory and persecutorial policy" against them in furtherance of BMSC's interest in taking control of SMI's management. Geraci and possibly others at BMSC contracted with certain named individuals to carry on the security investigation, which included conducting a surveillance of Appellants and their families, pressuring Appellants to testify falsely against SMI's management as part of BMSC's attempt to gain control over SMI, and using illegal means to obtain evidence to be used to dismiss Appellants. Geraci and Dunne individually interviewed SMI employees, including Appellants, as part of the ongoing security investigation. On or about the date of the individual interviews, Appellants were dismissed from their employment at SMI between March and

---

1. Appellants requested, and the court granted with prejudice, dismissal of their claim under Puerto Rico Law 100 of June 30, 1959, 29 L.R.P.A. § 146.

May 1992 without being told the reason for their dismissal. It is uncontested that no one else participated in these interviews except for a translator, that the interviews took place in a discrete manner, and that it was Appellants that subsequently publicized the details of the interviews.

### DISCUSSION

Appellants raise four challenges to the district court's grant of summary judgment: (i) discovery was improperly cut off; (ii) their production of documents was erroneously denied; (iii) summary judgment was erroneously granted on their conspiracy claims; and (iv) summary judgment was improperly granted on their breach of contract claim. We address each. Because the first two involve intertwining facts and the same standard of review, we address them together.

### A. Discovery Cut Off & Document Production

■ Appellants raise two discovery-related challenges on appeal. First, invoking Fed.R.Civ.P. 56(f), Appellants argue that the district court erred when it granted summary judgment without affording them the benefit of conducting a reasonable discovery. In support thereof, they claim they were diligent in their pursuit of discovery but that Appellees refused to comply with their requests and the district court granted summary judgment without acting upon their motions to compel discovery. Second, they claim error by the district court's denial of their February 9, 1994, request for production of certain documents. Appellees counter, asserting that the record clearly shows that the district court granted Appellants ample time to conduct discovery, and that they did not "hide" any information from Appellants. Thus, they contend that the district court did not abuse its discretion in denying their document production request as untimely.

■ It is well settled that the trial judge has broad discretion in ruling on pre-trial management matters, and we review the district court's denial of discovery for abuse of its considerable discretion. *See Fusco v. General Motors Corp.*, 11 F.3d 259, 267 (1st Cir.1993); *Serrano–Perez v. FMC Corp.*, 985 F.2d 625, 628 (1st Cir.1993). "We will intervene in such matters only upon a clear showing of manifest injustice, that is, where the lower court's discovery order was plainly wrong and resulted in substantial prejudice to the aggrieved party." *Mack v. Great Atlantic and Pacific Tea Co., Inc.*, 871 F.2d 179, 186 (1st Cir.1989). The same abuse of discretion standard applies to a review of a district court's denial of a Rule 56(f) motion. *See, e.g., Resolution Trust Corp. v. North Bridge Assoc., Inc.*, 22 F.3d 1198, 1203 (1st Cir.1994); *Price v. General Motors, Corp.*, 931 F.2d 162, 164 (1st Cir.1991).

Before addressing Appellants' arguments, we detail the pertinent procedural history as revealed by the relevant docket entries:

1. 8/10/92: Complaint filed.
2. 5/18/93: Scheduling Order sets discovery deadline for 10/15/93.
3. 10/18/93: Appellants move to extend discovery. New deadline set for 11/30/93.
4. 11/15/93: Appellants request document production pursuant to Fed.R.Civ.P. 34.
5. 11/18/93: Appellants move again to extend discovery. New deadline set for 1/3/94. Court states this is the last extension.
6. 12/8/93: Appellants move for status conference to clarify discovery and to further extend discovery by sixty days. Denied.
7. 12/17/93: Pretrial Conference set for 2/4/93.
8. 1/3/94: Appellants move to order witnesses to attend oral deposition. Denied (see 11, below).
9. 1/10/94: Appellees move for summary judgment (SJ).
10. 1/14/94: Appellants move for extension to oppose SJ. Granted. Opposition due by 2/20/94.
11. 1/14/94: Appellants move again to clarify discovery process. Denied, citing failure to comply with Fed.R.Civ.P. 45(c) regarding personal service of subpoena and noting that it cannot allow further disruption in the scheduling order.
12. 2/2/94: Appellees submit proposed pretrial order.
13. 2/3/94: Appellants file SJ opposition.
14. 2/4/94: Pretrial Conference. Court grants parties until 2/10/94 to prepare joint pretrial order. Court denies Appellees' motion to dismiss.
15. 2/9/94: Appellants move to supplement opposition to SJ, to compel document production, and to appoint special process server.
16. 2/10/94: Pretrial Conference. Appellants submit proposed pretrial order. Court grants pretrial order.
17. 2/17/94: Appellees file response to SJ opposition.
18. 3/11/94: Court grants SJ, denies Appellants' motion to compel document production and to appoint a special process server. Court enters partial judgment in favor

of Appellees. Appellants' severance pay claim, as ordered to be amended, remains.

19. 3/21/94: Appellants move to postpone jury trial to file reconsideration motions and motion for new trial. Granted.

20. 3/28/94: Appellants move for reconsideration of grant of SJ. Denied (see 22, below).

21. 3/29/94: Appellants move for additional discovery.

22. 6/5/95: Court denies Appellants' motion for reconsideration, grants Appellees' motion to strike third amended complaint, and denies Appellants' leave to file a fourth amended complaint.

We turn first to Appellants' reliance on Rule 56(f). Rule 56(f) "looms large" when a party claims an inability to respond to an opponent's summary judgment motion because of incomplete discovery, *Resolution Trust Corp.*, 22 F.3d at 1202, given that it is "intended to safeguard against judges swinging the summary judgment axe too hastily," *id.* at 1203. While certainly district courts should construe Rule 56(f) motions generously, we have noted that

> [t]his does not mean ... that [it] has no bite or that its prophylaxis extends to litigants who act lackadaisically; use of the rule not only requires meeting several benchmarks ..., but also requires due diligence *both* in pursuing discovery *before* the summary judgment initiative surfaces *and* in pursuing an extension of time thereafter. In other words, Rule 56(f) is designed to minister to the vigilant, not to those who slumber upon perceptible rights.

*Id.* at 1203 (emphasis added). We have also held that a party must invoke Rule 56(f) within a reasonable time following the receipt

of a motion for summary judgment. *Id.* at 1204.

With this rubric in mind, we find that Appellants' invocation of Rule 56(f) is misplaced for at least two reasons. First, the record shows that Appellants filed their original opposition to summary judgment without previously informing the court of their inability to properly oppose summary judgment due to incomplete discovery. In fact, Appellants never sought an additional extension of the discovery deadline before filing their opposition.[2] Moreover, both Appellants' original[3] and supplemental[4] oppositions to summary judgment are deafeningly silent as to their inability to oppose summary judgment due to incomplete discovery. The first time Appellants informed the district court about outstanding discovery was during the February 4, 1994, and February 10, 1994, pre-trial conferences, after having already filed their opposition and supplemental opposition respectively.

Second, we are hard-pressed to conclude that this record supports a finding that Appellants exercised due diligence or were otherwise "vigilant" *before* Appellees moved for summary judgment on January 10, 1994. After requesting and receiving two extensions, discovery concluded on January 3, 1994— almost eighteen months after Appellants filed their complaint on August 10, 1992, and almost eight months after the court's May 18, 1993, scheduling order. Appellants did not serve a request for document production until November 12, 1994, after they had received their first extension[5] and only two

---

**2.** While they did file on January 14, 1994, a motion to clarify the discovery process, they did not mention in that motion their need for additional discovery in order to properly oppose summary judgment. The district court denied their motion, noting their failure to comply with the Federal Rules of Civil Procedure regarding service and the ample time they had for discovery.

**3.** Appellants' ten-page opposition addressed the merits of Appellees' arguments in favor of summary judgment, attached various depositions and suggested that, if the court "[had] any doubt" about the truth as revealed by the attached depositions, it could schedule a hearing or grant additional time for Appellants to address in greater detail each of the "defendants' outrageous conclusions." Docket No. 50, p. 9. The only basis advanced for not responding to each of the arguments was "time restrictions."

**4.** While Appellants do state in their supplemental opposition that the records finally received from Appellees are "incomplete according to the depositions taken to [sic] co-defendants ... [which] are part of the record", Appellants do not argue that they are unable to oppose summary judgment because of incomplete discovery; indeed, they state that "although incomplete ... [these records] clearly reveal the discriminatory animus." Docket No. 51, p. 2.

**5.** In their first motion for extension, dated October 11, 1993, Appellants represented to the court that neither party had yet completed the interrogatories but that both parties had worked diligently in the matter.

weeks prior to the end of the new discovery period set for November 30, 1994.

Furthermore, Appellants failed to meet with Appellees pursuant to Local Rule 311.11 to discuss Appellees' timely objections to their document request—as set forth in two letters, dated November 24, 1993, and December 15, 1993—prior to the conclusion of discovery on January 3, 1994. *See* Local Rule 311.11. Pursuant to this Rule, parties are required to meet in a good faith effort to eliminate disputes regarding discovery prior to filing any discovery-related motion or objection. The Rule also provides that, unless relieved by agreement or by order of the court upon good cause shown, counsel must meet within ten days of service of a letter requesting a Rule 311.11 conference, and that Appellants—as the movants—bore the responsibility for arranging a conference. *See* Local Rule 311.11. Here, the record clearly shows that Appellants failed to comply with the Rule or carry their burden thereunder. Not only is it undisputed that the parties' Local Rule 311.11 meeting was not held until February 1, 1994—more than two months after Appellees' first timely objection and more than one month after Appellees' second letter which expressly invited Appellants' counsel to meet on December 27, 1993—but there is absolutely no evidence of timely notification to the court or of good cause for the failure to meet earlier or to timely advise the court.

Moreover, after Appellees filed their motion for summary judgment, Appellants never filed for another discovery extension *prior* to filing their opposition to summary judgment on February 3, 1994. As noted above, it was not until the February 4 and February 10 pre-trial conferences that Appellants informed the district court of Appellees' failure to produce documents—almost one month after the second-extended discovery period had concluded and the day after Appellants had filed their opposition to summary judgment.

Attempting nonetheless to invoke the benefits of Rule 56(f), Appellants argue that in order to trigger Rule 56(f) the nonmoving party need only submit an equivalent statement, preferably in writing, of their need for additional discovery. *See, e.g., St. Surin v.*

*Virgin Islands Daily News, Inc.,* 21 F.3d 1309, 1313–14 (3d Cir.1994); *Wichita Falls Office Assoc. v. Banc One Corp., et al.,* 978 F.2d 915, 919 (5th Cir.1992), *cert. denied,* 508 U.S. 910, 113 S.Ct. 2340, 124 L.Ed.2d 251 (1993). Relying on these two cases, they insist that they triggered Rule 56(f), because "through the whole procedure of the case [they] presented in writing and before the court more than plausible basis to believe that discoverable materials existed which were essential to their case and would raise truthworthy issues." Appellants' Brief, p. 24. Unlike Appellants here, the parties in those cases both requested Rule 56(f) extensions *after* the opposing party filed a motion for summary judgment, specified that discovery had not concluded, and identified the outstanding items which would be dispositive to the issues raised. More importantly, unlike the instant case, the facts in those cases indicated that the nonmovants had not been dilatory in obtaining discovery. *See St. Surin,* 21 F.3d at 1315 (concluding that nonmovant should not suffer from a failure of proof caused by his accommodation of the movant's requests for delay); *Wichita Falls,* 978 F.2d at 919 (finding that nonmovant was not dilatory because it reasonably awaited outcome of pending negotiations). In any event, we remain unpersuaded by Appellants' list of the allegedly numerous times they brought this matter to the court's attention; in fact, their list belies that they so informed the court. For example, contrary to their claim, Appellants' two-paragraph request for an extension to oppose summary judgment makes no reference whatsoever to discovery matters. Similarly, while Appellants claim that their opposition to Appellee's motion for summary judgment "state[d] to the Court the situation about the documents and information that defendants were refusing to provide," Appellants' Brief, p. 23, a review of their opposition reveals no such statement.

In light of the two extensions granted, the latter stating that this was the final extension, Appellants' failure to comply with Local Rule 311.11, and what appears to us as an overall lack of due diligence, we find no abuse of discretion by the district court. Contrary to Appellants' assertion, in no way

did the district court grant summary judgment "without [their] benefit to [sic] a reasonable discovery." Indeed, the district court was never put in the position of granting a Rule 56(f) motion given that Appellants only informed the court about Appellees' failure to produce discovery *after* the conclusion of discovery, *after* Appellants' oppositions to summary judgment had been filed, and on the eve of the pre-trial stage.

■ For obvious reasons, we also find no abuse of discretion by the district court when it denied what was clearly Appellants' untimely motion to compel document production. We remind Appellants that Local Rule 311.11 expressly prohibits the court from entertaining any motion relating to discovery unless the moving party—here, Appellants— first advised the court, in writing, that the parties have ·been unable to resolve their differences or reach an agreement after counsel have held the required conference, or that counsel for respondent has refused to confer or delayed the conference without good cause. *See* Local Rule 311.11. The first time Appellants provided written notification was on February 9, 1994. The court informed Appellants during the February 10, 1994, pre-trial conference that, had they timely filed a written motion to compel, the court could have requested the documents and made an in camera inspection of them to assess the legitimacy of Appellees' objections. As the district court correctly noted in its order denying Appellants' post-summary judgment motion requesting additional discovery and a new trial, Appellants waited more than one month after the second extended discovery deadline had elapsed to properly request an order from the district court. Appellants' claim that Appellees were "hiding" information is essentially irrelevant against the backdrop of their own lack of diligence as evidenced by the lateness of the Local Rule 311.11 meeting and their untimely motion to compel document production.

In sum, based on our review of the record, we find no abuse of discretion by the district court with respect to either of Appellants' claimed errors; indeed, in light of Appellants' lack of diligence and failure to follow the rules, we do not even find a hint of any

abuse of the district court's broad discretion. As we have stated before, "[s]ticking the appellate nose too readily into the district court's scope-of-discovery tent is, we think, a recipe for disaster." *Mack*, 871 F.2d at 187. Where, as here, the district court could have allowed further discovery, "it was certainly free to call the shot the other way." *Id.* None of Appellants' arguments, including those not addressed, persuade us that this record warrants a disruptive "nosey" appearance.

### B. Summary Judgment

#### 1. The Standard

■ We afford plenary review to the entry of summary judgment on Appellants' claims. *See, e.g., Perkins v. Brigham & Women's Hospital*, 78 F.3d 747, 748 (1st Cir.1996); *Smith v. F.W. Morse & Co.*, 76 F.3d 413, 428 (1st Cir.1996). The function of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir.1992), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993). "The criteria are familiar: a court may grant summary judgment if the *nisi prius* roll discloses no genuine issue of material fact and if, viewing the entire record in the light most flattering to the nonmovant, the proponent demonstrates its entitlement to judgment as a matter of law." *Perkins*, 78 F.3d at 748; *see* Fed. R.Civ.P. 56(c). In order to survive the "swing of the summary judgment axe," *Mack*, 871 F.2d at 181, the nonmoving party must produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

*Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2509–10 (emphasis in original). "[S]peculation and surmise, even when coupled with effervescent optimism that something definite will materialize further down the line, are impuissant in the face of a properly documented summary judgment motion." *Roche v. John Hancock Mutual Life Ins. Co.*, 81 F.3d 249, 253 (1st Cir.1996). "Moreover, '[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir.1993) (quoting *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990)).

■■■ Based upon our independent review of the summary judgment materials, we note as an initial matter that Appellants' challenge on appeal is augmented by its failure, as the district court noted, to present a thorough and specific opposition to Appellees' well-documented motion for summary judgment. Appellants' failure to provide a separate statement of disputed facts resulted in the district court's taking of Appellees' statement of uncontested facts as admitted. *See* Local Rule 311.12; *see also Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 930 n. 2 (1st Cir.1983). The district court also properly disregarded Appellants' numerous unsupported factual allegations. These missteps below accompany Appellants on appeal, making their challenge more of an uphill battle than it otherwise might have been. That said, we address each of their claims in turn.

### 2. The Section 1981 Claim

### The Law

■■■ In order to prevail under Section 1981, a plaintiff must prove purposeful employment discrimination: the ultimate issue is whether the defendant intentionally discriminated against the plaintiff, under the by-now familiar analytical framework used in disparate treatment cases under Title VII. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 2377–78, 105

L.Ed.2d 132 (1989). Absent direct evidence of race and/or national origin discrimination, the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973), comes into play. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 505–07, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993); *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); *Goldman*, 985 F.2d at 1116–17.

■■■ Under the *McDonnell Douglas* framework, a plaintiff first must make a *prima facie* showing of discrimination, established by proving: (i) that plaintiff is a member of a protected class; (ii) that plaintiff performed his or her job satisfactorily; (iii) that plaintiff was discharged; and (iv) that plaintiff's position remained open and was eventually filled by persons with plaintiff's qualifications. *St. Mary's Honor Center*, 509 U.S. at 506, 113 S.Ct. at 2746–47. A plaintiff's successful production of a *prima facie* case creates a presumption of discrimination. *Id.* Upon such a showing, the burden of production shifts to the defendant in order to show a legitimate, nondiscriminatory reason for plaintiff's termination. *Id.* If the defendant is successful, the plaintiff must then show that defendant's reason is merely pretextual and that defendant intentionally discriminated against him or her. *Id.* at 507, 113 S.Ct. at 2747–48. In the context of a summary judgment proceeding, once the employer articulates a legitimate, nondiscriminatory basis for its adverse employment decision, the plaintiff must offer direct or indirect evidence sufficient to show that the employer's decision to discharge him or her was wrongfully based on race or national origin. *See e.g., Pages–Cahue v. Iberia Lineas Aereas de Espana*, 82 F.3d 533, 536–37 (1st Cir.1996) (involving age discrimination claim) (collecting cases).

■■■ The *McDonnell Douglas* framework, however, only comes into play where there is no direct evidence of discrimination. In cases involving direct evidence of discriminatory motive, the burden of persuasion shifts from the employee to the employer,

who must then affirmatively prove that it would have made the same decision even if it had not taken the protected characteristic into account. *See e.g., Smith v. F.W. Morse & Co., Inc.,* 76 F.3d 413, 421 (1st Cir.1996) (citations omitted). While we have held that "[d]irect evidence is evidence which, in and of itself, shows a discriminatory animus," *see, e.g., Jackson v. Harvard Univ.,* 900 F.2d 464, 467 (1st Cir.1990), it is not always clear what constitutes direct evidence, *see Smith,* 76 F.3d at 421; *id.* at 431 (Bownes, Senior Circuit Judge, concurring) (noting that the majority reference to "smoking gun" evidence obscures the fact that this Circuit has yet to clearly define what constitutes direct evidence of gender discrimination).

 As far as the instant case is concerned, however, we do know that, at a minimum, direct evidence does not include stray remarks in the workplace, particularly those made by nondecision-makers or statements made by decisionmakers unrelated to the decisional process itself. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 251–52, 109 S.Ct. 1775, 1791–92, 104 L.Ed.2d 268 (1989) (plurality op.); *id.* at 277–78, 109 S.Ct. at 1804–06 (O'Connor, J., concurring); *Smith,* 76 F.3d at 433 (concurring opinion). While perhaps probative of discrimination, stray remarks do not satisfy a plaintiff's burden of proving discrimination by direct evidence. *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. at 1804–05 (O'Connor, J. concurring). In our view, such stray remarks lack the necessary link between the alleged speaker's discriminatory remark and the adverse employment decision. *Cf. Smith,* 76 F.3d at 421 (suggesting that direct evidence of employment discrimination based on gender would be "an admission by the employer that it explicitly took actual or anticipated pregnancy into account in reaching an employment decision").

 With the legal framework outlined, we turn to see whether Appellants can avoid

the "swing of the summary judgment axe," *Mack,* 871 F.2d at 181, mindful that a district court's grant of summary judgment against the employee will be upheld if the record is devoid of adequate direct or circumstantial evidence of the employer's discriminatory intent.

### Analysis

 In the instant case, the district court rejected Appellants' contention that they proved by direct evidence Appellees' discriminatory animus in terminating their employment. It focused on two remarks, disregarding others on the basis that they were not substantiated. We, too, follow the district court's steps and will focus only on the two properly substantiated remarks.[6] The summary judgment materials show that the two remarks upon which Appellants rely were made on or about the date of Appellants' respective dismissals. The first remark pointed to was allegedly made by Hackett, in which he stated that the company had a "black mafia [which was] getting rich at the expense of the company." Deposition of Serrano, p. 125, lines 21–23. The second was allegedly made by both Hackett and Geraci, in which they stated that Serrano, as a Puerto Rican, may never get another opportunity to work for a North American company if Serrano were to be fired by SMI. *Id.* at 86, lines 13–21.

As we understand Appellants' arguments, they essentially claim that the references to a "black mafia" and to their being Puerto Rican are "smoking gun" evidence of Appellees' discriminatory animus in terminating their employment. For this to be so, Appellants must demonstrate that "black mafia" refers to Appellants' racial or ethnic background and that these references were made in connection with the decisional process.

---

6. We decline Appellants' request to take into consideration the sworn statements submitted with their motion for reconsideration. Not only were they not part of the original summary judgment materials, but Appellants have not demonstrated why this new evidence could not have been timely provided with the summary judgment materials. *See Roche v. John Hancock Mu-* *tual Life Ins. Co.,* 81 F.3d 249, 253 (1st Cir.1996) ("Put bluntly, 'motions for summary judgment must be decided on the record as it stands, not on a litigant's visions of what the facts might some day reveal.'") (quoting *Maldonado–Denis v. Castillo–Rodriguez,* 23 F.3d 576, 581 (1st Cir. 1994)).

We turn first to the meaning of "black mafia." As an initial matter, we note that the record sheds little light on its meaning, and does not demonstrate that it has anything to do with Appellants' racial or ethnic background.[7] In fact, when pressed during oral argument, counsel for Appellants simply stated that he "gathered" it referred to Puerto Ricans. The very few references to "black mafia" pointed to by Appellants in their opposition to summary judgment suggest that "black mafia" referred to, as Appellant Serrano testified in his deposition, members of SMI's management "who were getting rich at the expense of the company, at [BMSC's] expense"; indeed, Serrano's testimony that the "['black mafia'] was made up by all the managers" seems to undercut Appellants' claim that Appellees were referring to them as members of a "black mafia." *Id.* at 125, lines 23–24. Based on the record, we are hard-pressed to conclude Appellees were referring to Appellants with a discriminatory animus based on their race or national origin.

 While we could end the inquiry here, we note that even assuming that the term "black mafia" was racially or ethnically charged, neither of these statements constitutes direct evidence of discrimination. While the close time frame between the interviews and the dismissals is suspicious, *see Smith,* 76 F.3d at 423 (noting temporal proximity as a factor); *id.* at 432 (citing cases), Appellants have not demonstrated—as the district court noted—that they were terminated because of their race or national origin or that the speakers were decisionmakers who made the comments in connection with the decisional process. Indeed, Hackett and Geraci are employees of BMSC, not SMI, and it is uncontested that Appellants were employees of SMI at the time of their dismissals.

Even assuming, as Appellants allege, that Hackett and Geraci ordered SMI's Human Resources Director to terminate Appellants' employment does not assist Appellants, because of their failure to provide specific factual support that the alleged remarks were made in connection with the employment decisional process. Resting on conclusory allegations, improbable inferences and unsupported speculation does not suffice. *See Goldman,* 985 F.2d at 1116. In other words, Appellants have failed to show what we consider to be the necessary link between the speakers' statements and the decision to terminate Appellants' employment. Our conclusion is particularly reinforced by the uncontested fact that Appellants did not mention their race or national origin as a factor when asked why they thought their employment had been terminated: some admitted that they had no knowledge of the reason while others offered the non-discriminatory reason that their dismissal was connected to the ongoing security investigation.[8]

For the foregoing reasons, we find no reason on this record to consider these alleged statements to be anything more than "stray remarks" which fail to satisfy Appellants' burden of production of direct evidence. We merely add this: contrary to what seems to drive Appellants' argument, the mere fact that it is possible, indeed probable, that there was some connection between Appellants' dismissal and the security investigation does not render Appellants' termination *ipso facto* discriminatory.

 Because we conclude that Appellants have failed to demonstrate discriminatory animus by direct evidence, we consider next whether Appellants can do so through a *prima facie* case. This analysis is, for Appellants, painfully quick: While they satisfy the first and third prongs, as they are members

---

7. In this regard, we note that use of the adjective "black" does not necessarily refer to skin color. It has been widely used to describe, among other things, sinister or evil actions or characters. *See Merriam Webster's Collegiate Dictionary,* Tenth Ed., pp. 118–20 (1993). "Mafia" is defined as a particular "criminal organization" or "a group of people likened to the Mafia," *id.* at 699. Taken together, "black" could arguably describe the collective skin color of the members of the criminal organization or the group's illegal, illicit or clandestine activities in a similar vein to "black market."

8. It is also uncontested that Appellants were not present when the decision to terminate their employment was made. We do not give this fact much weight considering that an employee's presence at that actual moment is more likely to be an anomaly than the rule.

of a protected class as Puerto Ricans and they were all terminated, they have not proven that they performed their jobs adequately or that persons with their qualifications filled their job positions; indeed, they do not even argue as much in their appellate brief. In light of their failure to prove a *prima facie* case, we do not need to proceed further with the *McDonnell Douglas* analysis.

In light of Appellants' failure to carry the ultimate burden of proving that Appellees discriminated against them on the basis of their race or national origin, we affirm the grant of summary judgment, pausing only to add this: The foregoing and, particularly, the plethora of allegations unclothed by any specific factual record evidence, suggest to us that Appellants' claims of discrimination based on race and national origin are but mere "unsupported conclusions ... [which plausibly] ... sprout[ed] as easily as crabgrass in an imaginative litigant's (or lawyer's) word processor." *The Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 16 (1st Cir. 1989) (noting that "to avoid tarring defendants' reputation unfairly and to prevent potential abuses, we have consistently required plaintiffs to outline facts sufficient to convey specific instances of unlawful discrimination.").

### 3. The Defamation Claim

■ Appellants claim damages from defamation based on four incidents: (i) alleged public and intraoffice accusations by Appellees that Appellants were thieves; (ii) newspaper articles which discussed, among other matters, the irregularities in SMI's inventory; (iii) the interviews in which Appellants were questioned while a third party, a translator, was present; and (iv) statements labeling Appellants as members of a "black mafia." The district court thoroughly reviewed Appellants' arguments in support of their claim, concluding that in each of the four instances Appellants—for a variety of reasons—failed to meet their burden of proving defamation. We agree.

■ "Under Puerto Rico law, a defamation claim requires that the plaintiff prove: (1) that the information is false, (2) that plaintiff suffered real damages, and (3)

in the case of a private figure plaintiff, that the publication was negligent." *Mojica Escobar v. Roca*, 926 F.Supp. 30, 33 (D.P.R. 1996) (citations omitted); *see also Pages v. Feingold*, 928 F.Supp. 148, 153 (D.P.R.1996) (noting that negligence in defamation cases is applied as interpreted under Section 1802 of the Civil Code, 31 L.P.R.A. § 5141); *Garib Bazán v. Clavell*, 94 J.T.S. 36, p. 11677 (1994). For both libel and slander, Puerto Rico law requires that plaintiff prove that the alleged defamation is false. *See* 32 L.P.R.A. § 3142 (defining libel); 32 L.P.R.A. § 3143 (defining slander); *see also Mojica Escobar*, 926 F.Supp. at 34; *Villanueva v. Hernández Class*, 91 J.T.S. 58, pp. 8696–97 (1991).

Here, what undercuts Appellants' defamation claim with respect to the first three instances is their failure to present a single shred of competent evidence, as distinguished from their conclusory assertions, which tends to establish the falsity of any of the alleged defamatory statements. Because of this failure to carry their burden of proof as to the falsity of those three statements, Appellants' defamation claim for both libel and slander based on the first three instances necessarily fails. *See Mojica Escobar*, 926 F.Supp. at 34 (granting summary judgment based on plaintiff's failure to carry burden of proving falsity of offending publications). Based on our review of the record, Appellants have utterly failed to carry their summary judgment burden of presenting definite, competent evidence to rebut Appellees' motion for summary judgment: they have failed to establish the existence of a genuine, material triable issue regarding the falsity of the alleged statements. The fact that Appellees do not assert the truth of the alleged statements is irrelevant here as Appellants have failed to establish an essential element of their claim. *Cf. id.* In light of this, we do not need to address the remaining elements in connection with the first three instances.

■ As to the fourth instance, regarding the "black mafia," the district court correctly dismissed this statement as proof of defamation in light of (i) Appellants' failure to provide affidavits or deposition testimony supporting this allegation and (ii) the fact that, while Appellant Serrano testified that Appel-

lee Hackett referred to a "black mafia," the reference was not made in connection to Appellants but, as discussed above, in reference to SMI's management.

Because we do not need to address whether Appellants carried their burden as to the remaining elements, we do not address their argument challenging the district court's grant of qualified immunity relating to the interviews in which Appellants were questioned. *See Porto v. Bentley Puerto Rico, Inc.,* 92 J.T.S. 175, 10248 (1992) (adopting the majority rule that *intra*corporate communication is equivalent to publication while also recognizing qualified immunity). We only add this: Even assuming that Appellants had submitted evidence that the alleged defamatory statements were false, based upon our review of the summary judgment materials and Appellants' arguments we would nonetheless conclude that their defamation claim fails and, thus, would affirm the district court's grant of summary judgment.

 Finally, Appellants also allege that the district court erred because there was sufficient evidence of a conspiracy under Puerto Rico law on the part of Appellees "to falsely accuse them of being thieves and drug dealers." *See* 33 L.P.R.A. § 4523(2)[9]; *see also People v. Arreche Holdun,* 114 P.R. Dec. 99 (1988). According to Appellants, the BMSC officials named as defendants in the action below came to Puerto Rico "with the task of framing and fabricating evidence to dismiss SMI officials so that BMSC could control key positions." For support, Appellants point us to their March 28, 1994, motion requesting additional discovery. As an initial matter, we note that Appellants neither included in their complaint a cause of action for conspiracy nor did the district court explicitly address conspiracy. Possible waiver aside, we decline to consider their March 28, 1994, motion for the simple reason that this was not part of the summary judgment record. What is more, based on our own review of the summary judgment materials, we find no record evidence to support Appellants' naked

assertion that Appellees framed false evidence against Appellants. While their supplemental opposition to summary judgment includes documents with references to a "gang" and a "mafia" and to the stealing of inventory from SMI, this does not prove there was a conspiracy. We need not consider this argument further.

### 4. The Invasion of Privacy Claim

 Appellants also seek damages based on Appellees' alleged violation of their right to privacy under the Puerto Rico Constitution, claiming that they were followed, telephoned, and photographed without their permission and put on an "industrial blacklist" which has hindered their efforts at securing new employment. A claim for invasion of privacy is actionable under Sections 1 and 8 of Article II of the Puerto Rico Constitution, which, respectively, provide that "[t]he dignity of the human being is inviolable" and that "[e]very person has the right to the protection of law against abusive attacks on his honor, reputation and private or family life." P.R. Const. art II, §§ 1, 8; *see generally, Mojica Escobar,* 926 F.Supp. at 34–35; *Lopez–Pacheco v. United States,* 627 F.Supp. 1224, 1227–29 (D.P.R.1986), *aff'd,* 815 F.2d 692 (1st Cir.1987). The district court granted summary judgment on the basis of Appellants' failure to provide any evidence that their privacy was invaded. Appellants do not explicitly appeal this aspect of the district court's decision. Waiver aside, we nonetheless note that, based upon our independent review of the record, we affirm the district court's grant of summary judgment for the very same reason enunciated by the district court.

### 5. Breach of the Employment Contract

 Appellants argue on appeal that the district court erred in dismissing their claim that BMSC violated the employment contract between SMI and Appellants inasmuch as BMSC did not comply with provisions in the Employee's Manual when it ordered SMI to

**9.** This section provides, in pertinent part:
If two or more persons conspire ... (2) to falsely or maliciously accuse another person of any crime, or to attempt that another to be charged or arrested for any crime; ... shall be punished by imprisonment ..., or a fine....
L.P.R.A. T.33 § 4523(2).

terminate Appellants' employment. *See Santiago v. Kodak Caribbean*, 92 J.T.S. 11, 9164 (1992) (holding that employee manuals describing rights and privileges constitute part of the employment contract and that dismissals in violation thereof are unjustified).[10]

The court dismissed their claim on the grounds that Appellants had failed to join an indispensable party, SMI, whose joinder would destroy the court's diversity jurisdiction.[11] Although Appellants argued that SMI was not indispensable because SMI officers acted at the direction of BMSC, the district court noted that their claim was inherently based on the fact that SMI officers breached the employment contract when terminating their employment. Citing Fed. R.Civ.P. 19(b), it concluded that, because SMI officers were thus actors in the alleged breach, SMI was an indispensable party. Noting its earlier factual finding, set forth in its decision granting partial summary judgment, that SMI is a separate entity from BMSC and that it was undisputed that SMI and Appellants are both citizens of Puerto Rico, the court concluded that SMI's joinder would result in the court lacking diversity jurisdiction. In reaching its decision, the district court also noted that Appellants could always bring their breach of contract claim in the Commonwealth courts.

Appellants argue on appeal that the district court erred in concluding that there was no diversity jurisdiction in only the briefest of manners, providing only one short paragraph without citation to case law or to Fed. R.Civ.P. 19. Apart from reiterating that SMI is a subsidiary under BMSC's "complete control" and that BMSC is a Delaware corporation with its principal place of business in New York, Appellants do not otherwise challenge or explain the error of the district court's earlier factual finding based on the summary judgment materials that SMI is a

separate company from BMSC. In a similarly superficial manner, Appellants merely reiterate that SMI is not an indispensable party because the injury and damages were caused by BMSC, providing no adequate basis for concluding why the district court erred in concluding that SMI, an actor in the alleged breach, was an indispensable party.

The weakness of Appellants' arguments here leads us to find waiver. *See, e.g., McCoy v. Massachusetts Inst. of Techn.*, 950 F.2d 13, 23 (1st Cir.1991) (finding waiver where party failed to meet affirmative responsibility of putting "best foot forward in an effort to present some legal theory that will support [its] claim"), *cert. denied*, 504 U.S. 910, 112 S.Ct. 1939, 118 L.Ed.2d 545 (1992); *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.) (reiterating that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"), *cert. denied*, 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990). Indeed, in light of Appellants' failure to even mention Rule 19, let alone claim error thereunder, we see no reason why we should embark on Rule 19's indispensable party analysis, *see* Fed.R.Civ.P. 19(b) (enumerating factors to be considered to determine whether in equity and good conscience courts should proceed without absent party when joinder would deprive the court of jurisdiction); *see also Pujol v. Shearson/American Express, Inc.*, 877 F.2d 132, 134–38 (1st Cir.1989) (discussing indispensable party analysis), and explore arguments on their behalf, *see McCoy*, 950 F.2d at 22 ("Overburdened trial judges cannot be expected to be mind readers.").

 We agree with the district court that inherent in Appellants' claim is that SMI officers were the actors in the alleged breach: while BMSC may have "ordered" Appellants' dismissal, it was SMI officers that did not comply with the dismissal provi-

---

**10.** Relying on *Santiago*, Appellants contend that their dismissal was unjustified because (i) they did not violate any of the listed violations and (ii) BMSC ordered their dismissal in violation of the established procedures. They also contend that BMSC violated its "Involuntary Termination Plan Policy" according to which any officer or employee dismissed up to December 1992, as a

result of the merger would be paid a certain severance amount.

**11.** Having previously dismissed the federal claims, the district court noted that its jurisdiction over the breach of contract claim was based on the diversity of the parties' citizenship.

sions set forth in the Employee Manual. In light of this and the two undisputed facts that SMI (i) is a separate legal entity from BMSC and (ii) was Appellants' employer at the time of their dismissal, we conclude that Appellants' cause of action for severance pay could not be brought against BMSC as any claim arising under the employment contract between Appellants and SMI should have been brought against SMI. Furthermore, while Appellants may not have their day in *federal* court, they are not—contrary to their assertions—deprived of their day in court: Because the applicable statute of limitations was tolled by Appellants' filing of their action in federal court, *see* 31 L.P.R.A. § 5303, Appellants will be able to file their claims based on breach of the employment contract, as well as other claims, in the Commonwealth court.

### CONCLUSION

Without commenting on the propriety of Appellants' dismissals or the manner in which they were dismissed, the district court's decision is ***affirmed*** for the foregoing reasons.